UNITED STATES DISTRICT COURT          EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| KIRK THOMAS and KT TRUCKING AND CATTLE, LLC, | § § § | |
| Plaintiffs, | § § | |
| *versus* | § § | CIVIL ACTION NO. 1:23-CV-282 |
| CITY OF PORT ARTHUR, TEXAS and FLOZELLE ROBERTS, | § § § | |
| Defendants. | § § | |

## MEMORANDUM AND ORDER

Pending before the court is Plaintiffs Kirk Thomas ("Thomas") and KT Trucking and Cattle, LLC's ("KT Trucking") (collectively "Plaintiffs") Motion for Summary Judgment (#26) and Defendants City of Port Arthur, Texas ("Port Arthur") and Flozelle Roberts's ("Roberts") (collectively "Defendants") Cross Motion for Summary Judgment (#34). Defendants filed a Response (#38) to Plaintiffs' Motion for Summary Judgment and Objections to Plaintiffs' Summary Judgment Exhibits (#39) to which Plaintiffs filed a Reply (#46) and a Response (#45), respectively. Additionally, Plaintiffs filed a Response (#40) to Defendants' Cross Motion for Summary Judgment, Defendants filed a Reply (#48), and Plaintiffs filed a Sur-Reply (#49). Having considered the pending motions, the submissions of the parties, the record, and the applicable law, the court is of the opinion that Plaintiffs' Motion (#26) should be DENIED and Defendants' Motion (#34) should be GRANTED in part and DENIED in part.

I.      Background

        A.      Factual Background

This lawsuit arises out of Port Arthur's designation of Sassine Avenue as a "no truck route." Thomas owns approximately 400 acres of land in Port Arthur, Texas, which has been in his family since 1913. The western boundary of Thomas's property runs parallel to the Port Arthur Canal and State Highway 93, also known as West Port Arthur Road. Thomas's property is zoned for industrial use. The property's southern border, however, abuts another plot of land that is zoned for residential use and may be accessed via Sassine Avenue. Sassine Avenue runs through the Montrose II neighborhood, which is zoned for single family, residential use. Due to its residential design and nature, Sassine Avenue is designated as a "no truck route," meaning that commercial vehicles over a certain weight limit are generally prohibited from driving on Sassine Avenue.

Over the years, Thomas has used his property to engage in various agricultural and commercial pursuits. Three of Thomas's undertakings are of particular import in this case. First, Thomas maintains a landfarming operation, which involves permitting third parties to dispose of "drilling mud" on his property. Drilling mud is a heavy, viscous fluid consisting of clay, chemicals, and water that is used in horizontal directional drilling and other oil and gas operations. A company drilling an oil or gas well or constructing an underground infrastructure for which drilling is required will circulate drilling mud around the drill bit to prevent it from overheating while in use. The drilling mud cools and lubricates the bit while also carrying rock cuttings to the surface. A company seeking to dispose of drilling mud may transport the mud to an approved landfarming site. At the landfarming site, a thin layer of mud will be applied to the land and

disked into the soil.  Because of the purportedly nutrient dense nature of water-based, organic drilling mud, the land may then be used to grow crops.  Landfarming is a highly regulated industry that requires parties to obtain a permit for each landfarming project.  Thomas does not have a permit to haul drilling mud.  Nevertheless, he makes his land available to third parties for the disposal of the mud.

Second, Thomas owns a commercial transportation company known as KT Trucking.  KT Trucking primarily transports oil field equipment.  Thomas uses his property to store 18-wheeler tractor trailers when they are not in use and, occasionally, to store the materials and equipment being hauled or delivered by KT Trucking.  Consequently, Thomas's trucking business requires large commercial vehicles to enter and exit his property frequently.

Lastly, Thomas's third endeavor relates to the construction of pipelines on his land.  Specifically, Thomas permits third parties to install pipelines on his property to transport oil and gas.  As a result, the pipeline companies travel to Thomas's property to construct the pipeline and then to inspect, repair, and replace various components of the pipeline over time.  Accordingly, Thomas's commercial pursuits generate a significant amount of industrial traffic to his property.

From 2007 to 2018, Thomas's property could be accessed via a bridge that he designed and built in 2007 (the "White Bridge") after an older bridge that had been the sole access point for his property fell into disrepair.  The White Bridge connects the western boundary of Thomas's property to West Port Arthur Road.  Thomas had to obtain approval from the Lower Neches Valley Authority ("LNVA") to build the bridge because it crosses the Port Arthur Canal, which is a part of the city's freshwater supply.  The LNVA granted Thomas the requisite permission on the condition that the bridge would be a private entrance for personal use only.  Also, in 2007,

Thomas traded some of his property to his neighbor, Joseph Sylvester ("Sylvester"), in exchange for five residentially zoned lots connecting Thomas's property to Sassine Avenue. Thomas maintains that, before the exchange, Sylvester consistently used Sassine Avenue as an entrance for 18-wheelers and dump trucks to access the junkyard that he ran on his property. Thomas claims that he did not know that Port Arthur had designated Sassine Avenue as a "no truck route" when he acquired the lots from Sylvester. The sign on Sassine Avenue in 2007 said "No Thru Trucks," which he thought referred to the fact that Sassine Avenue is a dead end. The sign was later changed to say "No Trucks."

Thomas asserts that he used Sassine Avenue to provide commercial access to his property without incident between 2007 and 2018. During that time, however, Thomas had to "mat in" the property that abutted Sassine Avenue each time that a commercial vehicle entered the property. This meant that Thomas had to lay down industrial wooden mats to enable the commercial trucks to enter Thomas's property. Consequently, in 2018, Thomas built a road across the five lots that connected his property to Sassine Avenue. Following the construction of the road, Thomas began his landfarming operation and directed commercial traffic to enter via Sassine Avenue.

On January 15, 2020, Thomas received a cease-and-desist letter from Port Arthur, informing him that his commercial use of Sassine Avenue was unauthorized. Port Arthur maintained that Thomas's use of Sassine Avenue violated Port Arthur Ordinance 106-7, which permits the Public Works Director to prohibit vehicles exceeding a certain weight limit from operating on specific roads. Thomas claims that, after receiving the letter, he sought advice from Port Arthur on how to obtain the appropriate permits to continue his use of Sassine Avenue. Port Arthur provided Thomas with a copy of the Port Arthur Commercial Use of Roadway Policy and

issued Thomas a temporary permit that gave him ten days to complete the landfarming project that was in progress when he received Port Arthur's letter.

Approximately ten months later, Thomas entered into an agreement with Larrett Energy Services ("Larrett") to permit the disposal of drilling mud on his property.  Port Arthur claims that it received multiple complaints regarding the repeated use of Sassine Avenue by large vehicles that were hauling an unknown substance continuously during the day and at night.  Allegedly, Thomas's neighbors reported that this activity was disturbing the peace of the neighborhood, endangering children, and damaging the road.  The Port Arthur Police Department responded to the reports and issued citations to Larrett's drivers for the unauthorized use of Sassine Avenue. Shortly thereafter, Thomas filed the present action.

B.    Procedural History

On October 20, 2020, Thomas filed suit in the 136th District Court of Jefferson County, Texas, seeking a temporary restraining order and a permanent injunction.  After a hearing on November 18, 2020, the court granted Thomas's request for a temporary restraining order and gave Thomas thirty days to apply for the appropriate permit.  On March 11, 2021, Thomas submitted an application that Port Arthur maintains was incomplete.  The application was rejected, and Thomas filed a renewed request for a temporary restraining order.  Thomas's request, however, was denied.

When the district court denied Thomas's second request for an injunction, the court also denied Defendants' amended plea to the jurisdiction.  Defendants' plea maintained that sovereign immunity barred Thomas's claims, the Defendants had not waived sovereign immunity, and the court could not provide equitable relief.  Defendants appealed the trial court's decision to the

Texas Ninth Court of Appeals in Beaumont, Texas.  On August 31, 2022, the Court of Appeals issued an opinion concluding that the district court had jurisdiction.

In March 2023, while the litigation remained pending, the Port Arthur Police Department responded to reports of unauthorized activity on Sassine Avenue and issued citations to drivers who were hauling drilling mud to Thomas's property.  Thomas renewed his request for injunctive relief, which was denied on March 28, 2023.  On March 30, 2023, Thomas submitted an application for a road use permit.  The Public Works Director, Roberts, rejected the application as administratively incomplete on April 5, 2023.  Thomas resubmitted his application on April 11, 2023, which was approved exactly one month later on May 11, 2023.

During the month of June, Thomas's counsel worked with Port Arthur's city attorney on a road use agreement for future hauling operations.  Port Arthur maintains that Thomas's counsel was uncooperative and delayed in reviewing the agreement.  On June 21, 2023, Thomas filed his Fifth Amended Petition (#2), alleging for the first time that the Surface Assistance Transportation Act ("STAA"), a federal law, preempted the application of Port Arthur's ordinances to Sassine Avenue.  On July 20, 2023, Defendants filed a Notice of Removal (#1), removing the case to this court on the basis of federal question jurisdiction.  On September 27, 2023, Thomas filed a Sixth Amended Complaint (#9) and joined KT Trucking as a plaintiff.

On August 9, 2024, Plaintiffs filed their Seventh Amended Complaint (#27), asserting five separate causes of action.[1]  First, Thomas maintains that Port Arthur improperly applied Ordinance

---

[1] Plaintiffs filed their Amended Motion for Summary Judgment (#26) on the same day that they filed their Seventh Amended Complaint (#27) and it appears the Complaint was filed *after* the Motion. Additionally, Plaintiffs did not request leave to file their Seventh Amended Complaint.  Nevertheless, Defendants have not objected or raised the issue and have treated the Complaint and Motion as being properly filed.  Thus, the court will address the submissions as if they were filed in the correct order and in a timely fashion.

106-8 to his use of Sassine Avenue.  Second, Thomas asserts that Port Arthur improperly refused to apply Ordinance 106-41(b)(13).  Third, Thomas contends that Port Arthur's ordinances violate § 81.0523 of the Texas Natural Resources Code.  Fourth, Thomas maintains that Port Arthur's enforcement of its ordinances is preempted by the STAA.  Finally, Thomas maintains that Roberts committed an *ultra vires* act in her capacity as Port Arthur's Public Works Director.

Plaintiffs also filed an Amended Motion for Summary Judgment (#26) on August 9, 2024, asking the court to grant summary judgment because Roberts improperly interpreted and applied Port Arthur's ordinances and, alternatively, Roberts's enforcement of the ordinances is preempted by other state and federal laws.[2]  Defendants filed an Amended Cross Motion for Summary Judgment (#34), seeking summary judgment on the grounds that Defendants are entitled to sovereign immunity and Thomas cannot bring a private action under the STAA.[3]

II.    Analysis

A.    Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Union Pac. R.R. Co. v. City of Palestine*, 41 F.4th 696, 703 (5th Cir. 2022); *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir.

---

[2] Plaintiffs filed their Original Motion for Summary Judgment (#10) on October 10, 2023.  The court entered a Scheduling Order (#21) denying Plaintiffs' motion subject to reassertion at any point before the new motions deadline.

[3] Defendants filed their Original Motion for Summary Judgment (#30) on August 16, 2024.  Defendants subsequently filed a Motion for Leave to File Amended Rule 56 Motion for Summary Judgment (#34), which was granted on December 18, 2024 (#51).

2021); *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019).  The parties seeking summary judgment bear the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022); *Goldring v. United States*, 15 F.4th 639, 644-45 (5th Cir. 2021); *Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 416-17 (5th Cir. 2021); *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019).  To warrant judgment in their favor, the movants "must establish beyond peradventure *all* of the essential elements of the claim or defense." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (quoting *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)); *accord Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011).

"A fact issue is 'material' if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015) (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)); *see MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368 (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)); *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th

Cir. 2021); *Dyer*, 964 F.3d at 379; *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016). The moving parties, however, "need not negate the elements of the nonmovant's case." *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014); *see Savoy v. Kroger Co.*, 848 F. App'x 158, 160 (5th Cir. 2021).

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting FED. R. CIV. P. 56(e)); *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023); *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 410 (5th Cir. 2020). The court "should review the record as a whole." *Black v. Pan Am. Lab'ys, L.L.C.*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be construed in the light most favorable to the nonmoving parties, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022); *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021); *Lyons v. Katy Ind. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020). The evidence of the nonmovants is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in their favor. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S.

at 255); *Seigler*, 30 F.4th at 476; *Batyukova*, 994 F.3d at 724; *Lyons*, 964 F.3d at 302.  The evidence is construed "in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)); *accord Lexon Ins. Co., Inc.*, 7 F.4th at 321; *Geovera Specialty Ins. Co. v. Odoms*, 836 F. App'x 197, 200 (5th Cir. 2020) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

In reviewing "cross-motions for summary judgment, the court examines 'each party's motion independently' and views 'the evidence and inferences in the light most favorable to the nonmoving party.'" *Springboards To Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 811 (5th Cir. 2019) (quoting *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009)); *accord Siplast, Inc. v. Emps. Mut. Cas. Co.*, 23 F.4th 486, 492 (5th Cir. 2022).  Cross-motions for summary judgment will not, in and of themselves, warrant the granting of summary judgment unless one of the parties is entitled to judgment as a matter of law.  *Joplin v. Bias*, 631 F.2d 1235, 1237 (5th Cir. 1980); *Bricklayers, Masons & Plasterers Int'l Union of Am. v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975); *Newell-Davis v. Phillips*, 592 F. Supp. 3d 532, 545 (E.D. La. 2022), *aff'd*, No. 22-30166, 2023 WL 1880000 (5th Cir. Feb. 10 2023); *Wilson v. Tessmer L. Firm, PLLC*, 483 F. Supp. 3d 416, 423 (W.D. Tex. 2020).  The rationale for this rule is that each party may move for summary judgment using different legal theories that rely upon different sets of material facts.  *Bricklayers, Masons & Plasterers Int'l Union of Am.*, 512 F.2d at 1023; *Smith v. Twin Vill. Mgmt. LLC*, No. 1:19-CV-406-DAE, 2021 WL 2772811, at *3 (W.D. Tex. Apr. 26, 2021); *Wilson*, 483 F. Supp. 3d at 423.  Nonetheless, cross-motions for summary

judgment may be probative of the absence of a factual dispute when they reveal a basic agreement concerning what legal theories and material facts are dispositive. *Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 700 (5th Cir. 2020); *Bricklayers, Masons & Plasterers Int'l Union of Am.*, 512 F.2d at 1023; *Penn-Am. Ins. Co. v. Dominguez*, No. 6:21-CV-211-JDK, 2021 WL 5578684, at *2 (E.D. Tex. Nov. 30, 2021); *Wilson*, 483 F. Supp. 3d at 423.

### B.   Evidentiary Objections to the Summary Judgment Record

Defendants object to four exhibits attached to Plaintiffs' motion for summary judgment. A party may object to materials offered as summary judgment evidence when the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. FED. R. CIV. P. 56(c)(2); *Klocke v. Watson*, No. 20-10103, 2021 WL 5871884, at *15 (5th Cir. Dec. 10, 2021); *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012). In evaluating admissibility, summary judgment evidence is subject to the same standards and rules that govern the admissibility of evidence at trial. *Damas v. Tex. Health Presbyterian Flower Mound*, No. 4:20-CV-00686-ALM-CAN, 2022 WL 831813, at *5 (E.D. Tex. Jan. 28, 2022) (citing *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 650 n.3 (5th Cir. 1992)).

### 1.   Plaintiff's Exhibit S

Defendants first object to Plaintiffs' Exhibit S on the grounds that it is inadmissible hearsay for which there is no exception under the Federal Rules of Evidence. Plaintiffs' Exhibit S contains a letter from the Lower Neches Valley Authority, also known as the LNVA. On May 13, 2011, the LNVA sent Thomas a letter directing him to complete five different tasks within 30 days of receiving the letter. One of those tasks required Thomas to notify all third parties that they must obtain authorization from the LNVA before using the White Bridge. Plaintiffs contend that

11

Exhibit S does not constitute inadmissible hearsay because it does not contain an assertion of fact as required by the definition of hearsay contained in Rule 801. Rather, they maintain the letter is merely a list of commands or instructions that cannot be offered for the truth of the matter asserted.

Rule 801 of the Federal Rules of Evidence defines hearsay as a statement that the declarant does not make while testifying at the hearing that is offered to prove the truth of the matter asserted. FED. R. EVID. 801. There exists conflicting authority on the issue of whether non-assertive verbal conduct, such as a command,[4] can be categorically classified as non-hearsay. *See* 30B JEFFREY BELLIN, FEDERAL PRACTICE AND PROCEDURE § 6726 (2024 ed.); 6 MICHAEL GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 801:4 n.2 (9th ed. 2024). Nevertheless, the United States Court of Appeals for the Fifth Circuit has held that non-assertive verbal conduct is not hearsay. *United States v. Ned*, 637 F.3d 562, 569 (5th Cir. 2011) ("Non-assertive oral conduct is simply not hearsay"); *United States v. Weeks*, 919 F.2d 248, 251 (5th Cir. 1990). Accordingly, a command generally does not constitute inadmissible hearsay. *Ned*, 637 F.3d at 569; *Lone Star Tech. Innovations, LLC v. Asustek Comput. Inc.*, No. 6:19-CV-00059-RWS, 2022 WL 21714403, at *16 (E.D. Tex. June 23, 2022).

Here, the letter from the LNVA does not constitute hearsay. The letter is offered for the purpose of showing that Thomas was directed by the LNVA to prevent third party use unless the appropriate authorization was acquired. The letter contains a list of commands and directives that are not offered to prove the truth or falsity of any of the contents contained within. Additionally,

---

[4] Generally, a command is considered non-assertive verbal conduct because the statement is not made with the intent to declare that something is true or false, but rather, it is a directive to be followed. *See* 30B JEFFREY BELLIN, FED. PRAC. & PROC. EVID. § 6726 (2024 ed.).

the letter falls squarely within the category of non-assertive verbal conduct because it contains various commands and instructions that are not intended as assertions. Therefore, Defendants' objection to Plaintiffs' Exhibit S is overruled.

2.    Plaintiffs' Exhibit V

Defendants also object to Plaintiffs' Exhibit V on the grounds that it is inadmissible hearsay. Defendants contend that Exhibit V is testimony given in a separate criminal proceeding where neither Defendant was a party, nor did they have an opportunity to cross-examine the witness. Exhibit V is Thomas's sworn testimony in a criminal proceeding, *State of Texas v. Broderick Mathes*, before the County Court at Law No. 2 of Jefferson County, Texas. Plaintiffs respond to Defendants' objection by noting that a transcript of a judicial proceeding may be considered as summary judgment evidence on the same basis as an affidavit, and that Thomas's testimony can be presented in an admissible format at trial. Thus, Plaintiffs contend that Defendants' objection should be overruled.

As noted above, evidence at the summary judgment stage does not have to be presented in an admissible format. *Klocke*, 2021 WL 5871884, at *15; *Trujillo v. Volt Mgmt. Corp.*, No. EP-CV-00337-DCG, 2020 WL 1906097, at *4 (W.D. Tex. Apr. 17, 2020). Rather, the evidence simply needs to be capable of being presented in an admissible format at trial. *Rosales v. Coca-Cola Sw. Beverages LLC*, No. EP-CV-361-PRM, 2019 WL 1493359, at *4 (W.D. Tex. Apr. 3, 2019). Here, the underlying content in Exhibit V can readily be presented in an admissible format at trial, as Thomas need only take the witness stand and testify. Additionally, Defendants' concern that they were unable to cross-examine Thomas is misplaced. First, judicial testimony has been recognized as acceptable summary judgment evidence. *Tijerina-Salazar v.*

13

*Venegas, III*, No. PE:19-CV-00074, 2022 WL 1927007, at *21 n.6 (W.D. Tex. June 3, 2022);

*Henriquez v. City of Farmers Branch*, No. 3:16-cv-868-M-BN, 2022 WL 3127838, at *10 (N.D.

Tex. July 8, 2022) (citing *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1415 n.12 (5th Cir.

1993)). Additionally, judicial testimony is accepted on the same basis as an affidavit, and the

opportunity of cross-examination is irrelevant to whether an affidavit may be considered.

*Henriquez*, 2022 WL 3127838, at *10. Therefore, Defendants' objection to Plaintiffs' Exhibit V

is overruled.

        3.     <u>Plaintiff's Exhibit BB</u>

Defendants object to Plaintiffs' Exhibit BB on the grounds that it is hearsay and improper

expert testimony. Plaintiffs' Exhibit BB is the transcript of Raegan Droddy's ("Droddy")

testimony in *State of Texas v. Broderick Mathes*. Defendants' hearsay objection is overruled for

the same reasons expressed with respect to Exhibit V. Additionally, Defendants' contention that

Droddy's testimony constitutes improper expert testimony is rejected for the same reasons

expressed in this court's Memorandum and Order (#53) signed on February 12, 2025, denying

Defendants' Motion to Strike Plaintiffs' Expert Raegan Droddy (#29). Therefore, Defendants'

objections under Rule 802 and 702 are overruled.

        4.     <u>Plaintiffs' Exhibit CC</u>

Defendants object to Plaintiffs' Exhibit CC on the grounds that it constitutes inadmissible

hearsay and is irrelevant under Federal Rule of Evidence 401. Both parties represent that Exhibit

CC contains the transcript of the testimony of Broderick Mathes ("Mathes") in the *State of Texas*

*v. Broderick Mathes*. Mathes is a truck driver who received a citation for operating an

unauthorized vehicle on Sassine Avenue. Plaintiffs respond by stating that Mathes's testimony is

not inadmissible hearsay, as Mathes will be available to testify at trial. Additionally, Plaintiffs note that the testimony is relevant because it demonstrates the outcome of a case that involved the same underlying facts.

Neither Plaintiffs nor Defendants accurately characterize Exhibit CC. Exhibit CC does not contain the "[t]ranscript of a truck driver's testimony" as Defendants state and it is not "a transcript of Broderick Mathes' sworn testimony." Rather, Exhibit CC appears to be a transcript reflecting the verdict of the jury in the case of the *State of Texas v. Broderick Mathes*. Consequently, the court finds the assurance that Mathes will be available to testify at trial of little relevance to the present analysis.

The parties do, however, appear to address, at least marginally, the issue of whether a prior verdict constitutes inadmissible hearsay. As noted above, hearsay is an out-of-court statement offered for the truth of the matter asserted. FED. R. EVID. 801. A prior acquittal is hearsay and will be excluded unless an exception to the rule against hearsay applies. *United States v. De La Rosa*, 171 F.3d 215, 219 (5th Cir. 1999); *United States v. Taylor*, No. 22-184, 2024 WL 2979453, at *2 (E.D. La. June 13, 2024) ("[P]rior acquittals are inadmissible hearsay"). Plaintiffs, however, assert that Rule 803(22) excepts prior verdicts from the rule. Plaintiffs do not, however, endeavor to explain how the requirements of Rule 803(22) are met.

Rule 803(22) provides:

Evidence of a final judgment of conviction [is admissible] if:

> (A)     the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;

> (B)     the conviction was for a crime punishable by death or imprisonment for more than a year;

(C)     the evidence is admitted to prove any fact essential to the judgment; and

(D)     when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.

FED. R. EVID. 803(22).  Rule 803(22) clearly provides that only a "judgment of conviction" is admissible under the cited exception.  *Id.*  Here, Mathes was found *not guilty* by the jury, meaning that he was not convicted.  Therefore, Rule 803(22) does not apply.  Accordingly, Defendants' objection to Exhibit CC is sustained because the exhibit contains inadmissible hearsay.

### C.     Sovereign Immunity

#### 1.     Sovereign and Governmental Immunity

In Texas, it has long been recognized that sovereign immunity, unless waived, protects the State, its agents, and its officials from lawsuits for damages.  *See Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 19 (Tex. 2024); *City of Buffalo v. Moliere*, 703 S.W.3d 350, 353 (Tex. 2024); *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 839 (Tex. 2018).  A governmental entity has sovereign immunity and cannot be held liable for the actions of its employees unless there is a constitutional or statutory provision waiving such immunity.  *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016) ("The state or governmental unit can be sued only if the Legislature waives immunity in 'clear and unambiguous language.'" (citing TEX. GOV'T CODE § 311.034)); *accord Harris County v. Annab*, 547 S.W.3d 609, 613 (Tex. 2018); *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014).  "While sovereign immunity protects the State and its agencies, governmental immunity provides similar protection to the State's political subdivisions, such as counties, cities, and school districts."  *Gulf Coast Ctr. v. Curry*, 658 S.W.3d 281, 284 (Tex. 2022); *Calhoun v. Villa*, 761 F. App'x 297, 300 (5th Cir. 2019); *Hays St. Bridge*

16

*Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 703 (Tex. 2019); *see* TEX. CIV. PRAC. & REM. CODE § 101.001(3) (defining "governmental unit"). "Governmental immunity defeats a court's jurisdiction." *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 927 (Tex. 2015); *accord Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). When asserting a claim against a governmental unit, "the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Ryder Integrated Logistics, Inc.*, 453 S.W.3d at 927 (citing *Whitley*, 104 S.W.3d at 542); *accord Calhoun*, 761 F. App'x at 300; *Annab*, 547 S.W.3d at 612-13.

Governmental immunity can be waived only through the legislative use of clear and unambiguous language. *Tex. Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020); *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011). As the Fifth Circuit noted in *Kamani v. Port of Hous. Auth.*:

> The history of sovereign immunity and the practical necessity of unfettered freedom for government from crippling interferences require a restriction of suability to the terms of the consent, as to persons, courts and *procedure*.

702 F.2d 612, 615 (5th Cir. 1983) (quoting *Great N. Life Ins. Co. v. Read*, 322 U.S. 47, 53 (1944)). A governmental entity, however, that removes a case to federal court has consented to the federal court's jurisdiction, thereby waiving its immunity to suit. *Ukpong v. Int'l Leadership of Tex.*, No. 21-11111, 2022 WL 6935140, at *3 (5th Cir. Oct. 12, 2022) (citing *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 255 (5th Cir. 2005)). Removal does not, however, waive an entity's immunity to liability. *Id.*

Here, Defendants removed the present action to federal court. Consequently, Defendants have consented to the jurisdiction of the federal court and waived their immunity, if any, to suit.

Nevertheless, Defendants contend that they are entitled to summary judgment because Plaintiffs cannot establish that Defendants have waived their immunity to liability. Plaintiffs respond by stating that Defendants are not entitled to governmental immunity because Roberts committed at least one, if not multiple, *ultra vires* acts in her capacity as Port Arthur's Public Works Director.

2.    The Ultra Vires Exception

As noted above, a state, municipal, or local government is immune from liability absent a waiver of such immunity. *State v. Zurawski*, 690 S.W.3d 644, 660 (Tex. 2024). Generally, a waiver of immunity must come in the form of a legislative act that clearly and specifically waives the entity's governmental immunity. *Christ v. Tex. Dep't of Transp.*, 664 S.W.3d 82, 86 (Tex. 2023). An exception, however, to the doctrine of governmental immunity applies when an official commits an *ultra vires* act. *Hartzell v. S.O.*, 672 S.W.3d 304, 311 (Tex. 2023).

An *ultra vires* act occurs when a public official acts without legal authority or fails to perform a purely ministerial act. *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017). An official acts without legal authority when:

(1) she exceeds the bounds of her granted authority; or

(2) she acts in conflict with the law itself.

*Id.*; *see Chambers-Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 349 (Tex. 2019) (citing *Hous. Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016)). Courts have reasoned that governmental immunity is designed to protect an officer in the exercise of her discretion. *Chambers-Liberty Cntys. Navigation Dist.*, 575 S.W.3d at 349. Consequently, acts that exceed her discretion, or are made without legal authority, are not protected. *Id.*

Additionally, an official is not protected when she commits an act that conflicts with the law itself, because an official "has no discretion or authority to misinterpret the law." *Id.*

The rationale underlying the exception is that an *ultra vires* act by an official should not be considered an act by the governmental entity at all. *Hall*, 508 S.W.3d at 238; *Woodard v. Dallas County*, No. 05-22-01141-CV, 2024 WL 4866689, at *13 (Tex. App.—Dallas Nov. 22, 2024, pet. filed). Consequently, such an act should not be afforded the protections provided to states and local entities under the doctrine of governmental immunity. *Id.* Moreover, the *ultra vires* exception is not seen as an attempt by the judiciary to exert control over the state. *Hall*, 508 S.W.3d at 238. Rather, the denial of governmental immunity when an *ultra vires* act has been committed aids the state to reassert control over one of its agents. *Id.*

3.      Plaintiffs' Ultra Vires Claims Against Port Arthur

Defendants assert that Thomas's first three claims against Port Arthur are barred by governmental immunity or, alternatively, are not actionable under the Declaratory Judgment Act. Plaintiffs respond by stating that his first three causes of action contain viable *ultra vires* claims against Port Arthur that are not barred by governmental immunity.[5] Thomas's Seventh Amended Complaint (#27) outlines its first three claims as follows:

**CAUSE OF ACTION ONE: DECLARATORY JUDGMENT AGAINST THE CITY OF PORT ARTHUR BECAUSE[] ORDINANCE 106-8 IS INAPPLICABLE.**

---

[5] The court questions the veracity of Plaintiffs' contention, as their Seventh Amended Complaint (#27) asserts its first three causes of action without discussing or mentioning the *ultra vires* doctrine. Additionally, the same Complaint asserts a separate fifth cause of action against Roberts in her official capacity under the *ultra vires* exception. Additionally, Plaintiffs' Motion for Summary Judgment does not discuss the *ultra vires* exception. Nevertheless, the issue is moot, as Plaintiffs' first three claims against the city fail even assuming that Plaintiffs pleaded an *ultra vires* cause of action.

**CAUSE OF ACTION TWO: DECLARATORY JUDGMENT AGAINST THE CITY OF PORT ARTHUR BECAUSE[] ORDINANCE 106-41(B)(13) IS APPLICABLE.**

**CAUSE OF ACTION THREE: DECLARATORY JUDGMENT AGAINST THE CITY OF PORT ARTHUR FOR THE COMMERCIALLY UNREASONABLE ENFORCEMENT OF CITY ORDINANCES IN VIOLATION OF STATE LAW.**

As a technical matter, an *ultra vires* claim that does not challenge the validity of the statute cannot be maintained against the governmental entity. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372-73 (Tex. 2009). Rather, such claims are restricted to seeking relief from government officials in their official capacity. *Id.*; *Bryan v. Cano*, No. No-CV-025-DC, 2021 WL 12301968, at *11 (W.D. Tex. Dec. 15, 2021). Consequently, an *ultra vires* suit that does not challenge the validity of the statute "cannot be brought against the [governmental entity] which retains immunity, but must be brought against the state actors in their official capacity." *Scott-Nixon v. Tex. Higher Educ. Coordinating Bd.*, No. 03-10-00377, 2012 WL 1582270, at *3 (Tex. App.—Austin May 4, 2012, no pet.).

Plaintiffs' representation that they intended to plead three *ultra vires* claims against Port Arthur appears to be, at a minimum, disingenuous. Nevertheless, even if the court were to assume Plaintiffs pleaded *ultra vires* claims against Port Arthur, such claims would be barred by governmental immunity. Here, Plaintiffs' first three claims challenge the manner in which the ordinances were interpreted and applied, not the validity of the ordinances themselves. As a result, the governmental entity, Port Arthur, retains its immunity.[6] *Bryan*, 2021 WL 123001968,

---

[6] The Texas Ninth Court of Appeals reached the same conclusion when reviewing the Defendants' Plea to the Jurisdiction on appeal in the state court proceedings. *City of Port Arthur v. Thomas*, 659 S.W.3d 96, 114-15 (Tex. App.—Beaumont 2022, no pet.).

at *11. Therefore, Port Arthur is entitled to summary judgment on Plaintiffs' first three claims because an *ultra vires* claim against a governmental entity is not recognized under Texas law.

It is important to note, however, that this distinction is hyper-technical in nature and has a minimal impact on the present case. "A suit against a state official in his official capacity is *not* a suit against the official personally, for the real party in interest is the [governmental] entity." *ASM Global, LLC v. Weaver*, No. 08-24-00044-CV, 2024 WL 4416005, at *5 (Tex. App.—El Paso Oct. 4, 2024, no pet.); *see SaveRGV v. Tex. Gen. Land Off.*, No. 13-22-003580-CV, No. 13-22-00359-CV, No. 13-22-00360-CV, 2024 WL 385656, at*5 (Tex. App.—Corpus Christi-Edinburg Feb. 1, 2024, pet. filed). Additionally, "[s]uch a suit actually seeks to impose liability against the governmental unit rather than on the individual specifically named and "is, in all respects other than name, . . . a suit against the entity." *Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (citing *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855-56 (Tex. 2002). Therefore, though Plaintiffs cannot legally maintain a cause of action against Port Arthur, the city may still face liability in the event Plaintiffs can successfully establish an *ultra vires* cause of action against Roberts.

### 4.     Plaintiffs' Ultra Vires Claims Against Roberts

As discussed above, an ultra vires suit must be brought against a public official in his or her official capacity. Plaintiffs assert an *ultra vires* cause of action against Roberts in her official capacity as Port Arthur's Public Works Director. In their Complaint, Plaintiffs advance three theories to support their contention that Roberts committed an *ultra vires* act. First, Plaintiffs contend that Roberts exceeded her discretion when she applied Ordinances 106-7 and 106-8 to Plaintiffs' use of Sassine Avenue. Second, Plaintiffs maintain that Roberts exceeded her authority

when she determined that the exception in Ordinance 106-41(b)(13) did not apply. Finally, Plaintiffs assert that Roberts acted in conflict with state law by applying the ordinances in a manner that is purportedly inconsistent with § 81.0523 of the Texas Natural Resources Code.

Plaintiffs' motion for summary judgment maintains that they are entitled to summary judgment on their claims against Roberts. Despite not mentioning the *ultra vires* exception, Plaintiffs assert that Roberts incorrectly interpreted and applied Port Arthur's ordinances as a matter of law. Defendants, however, assert in their cross-motion that Roberts is entitled to summary judgment because her actions were not *ultra vires*. Therefore, the court must evaluate whether Roberts acted within her authority in interpreting and applying Ordinances 106-7, 106-8, and 106-41.

### a.    Port Arthur Ordinances 106-7 and 106-8

Plaintiffs first challenge Roberts's application of Ordinances 106-7 and 106-8, claiming that she exceeded her authority as the Public Works Director by applying the ordinances in the present case. Ordinance 106-7 provides that "the chief of police, or his designee and the director of public works are authorized to determine and designate those streets upon which commercial vehicles exceeding 10,000 pounds may be prohibited from operating." Port Arthur, Tex., Ordinance 106-7 (June 21, 2024). Plaintiffs' contention with respect to Ordinance 106-7 is unclear. Plaintiffs' Complaint primarily discusses the inapplicability of Ordinance 106-8, but Plaintiffs' motion and responses conflate Ordinances 106-7 and 106-8 by stating that "ordinance 106-7 and 106-8 do not apply . . . because Plaintiffs are not construction companies or operating construction vehicles." For clarity, the word "construction" does not appear anywhere in ordinance 106-7, and the language of the ordinance does not imply that the ordinance is a prohibition only on vehicles

engaged in construction work. Rather, 106-7 enables the Public Works Director to designate streets where use by any commercial vehicle that exceeds the legal limit of 10,000 pounds may be prohibited. In the present case, it is undisputed that Sassine Avenue was designated as a no truck route, regardless of Thomas's purported lack of notice of that fact, since at least 2007. Therefore, Roberts did not commit an *ultra vires* act in applying Ordinance 106-7 to Plaintiffs, because she was acting squarely within her powers to prohibit commercial vehicles that exceed the legal weight limit from operating on Sassine Avenue.

Moreover, the mere fact that Roberts, or her predecessor had not enforced Ordinance 106-7 in the past does not negate her authorization to do so now. The Ninth Texas Court of Appeals recognized in a prior iteration of the present proceedings that evidence that the previous Public Works Director had not exercised his authority under 106-7 for a number of years does not mean that he lost his authority to do so. *Thomas*, 659 S.W.3d at 112. The authority of the Public Works Director is outlined and defined by Port Arthur's ordinances and does not change based on the action or inaction of any one person who occupies that role. *Id.* at 111-12. Accordingly, Roberts did not exceed her authority under Ordinance 106-7.

Alternatively, Plaintiffs maintain that Roberts committed an *ultra vires* act by applying Ordinance 106-8 to Plaintiffs because their use of Sassine Avenue does not involve the operation of construction equipment and vehicles. Ordinance 106-8 provides in relevant part:

> Notwithstanding the provisions of subsection 106-7(a), no person shall operate construction equipment and vehicles in excess of the legal load limits on streets other than those designated for commercial vehicles, except in accordance with the following provisions: In connection with the following agreement, the applicant shall furnish at his expense a corporate surety performance bond, as set forth in the prescribed agreement, in an amount determined by the department of public works, based on the estimated cost to the city, at the time of the agreement, for materials,

23

labor, and equipment which would be reasonably necessary to reconstruct the
particular roadway covered by the agreement.

Port Arthur, Tex., Ordinance 106-8 (June 21, 2024).

Roberts did not commit an *ultra vires* act by applying Ordinance 106-8 to Plaintiffs' use of Sassine Avenue. The Texas Supreme Court has recognized on numerous occasions that an "[u]ltra vires claim depends on the scope of the state official's authority, not the quality of the official's decisions." *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 68 (Tex. 2018); *see Van Boven v. Freshour*, 659 S.W.3d 396, 402 (Tex. 2022). An official does not commit an *ultra vires* act by making an erroneous decision, so long as the decision was within the authority granted. *Van Boven*, 659 S.W.3d at 402.

In the present case, Roberts acted within her authority as the Public Works Director when she applied Ordinance 106-8 to Plaintiffs' use of Sassine Avenue. This proposition remains true regardless of whether Roberts's interpretation of Ordinance 106-8 was ultimately correct. Ordinance 106-41(a) specifically defines the powers and duties of the Department of Public Works. In relevant part, the ordinance provides that "[i]t shall be the general duty of the department of public works to . . . plan the operation of traffic on streets and highways of this city." Port Arthur, Tex., Ordinance 106-41(a) (June 21, 2024). Ordinance 106-8 outlines a specific facet of such planning by tasking the Department of Public Works with reviewing and negotiating road use agreements for vehicles engaged in construction-related activities. Additionally, because commercial vehicles that exceed the legal weight limit are not permitted to use the no truck route anyway, it seems logical that the Public Works Director would have the authority to determine whether an applicant or, in this case, a unauthorized user may qualify for the exception contained in Ordinance 106-8.

24

Moreover, Roberts's conclusion that Plaintiffs were operating construction vehicles was not baseless. Plaintiffs use Sassine Avenue to provide access for many of their commercial endeavors. One such endeavor includes the construction, maintenance, and repair of pipelines on Thomas's property. This means at least a portion of the commercial traffic traveling to Thomas's property is engaged in construction. Additionally, Plaintiffs note in their motion that drilling mud is used in "drilling oil and gas wells and drilling tunnels for the installation of oil and gas pipelines." As a result, Roberts concluded that at least some of Thomas's landfarming operation is tangentially related to construction activities that require drilling. Therefore, Roberts did not commit an *ultra vires* act by applying Ordinances 106-7 and 106-8 to Thomas's use of Sassine Avenue.

b.    Port Arthur Ordinance 106-41(b)(13)

Plaintiffs also contend that Roberts committed an *ultra vires* act by refusing to apply the exception contained in Ordinance 106-41(b)(13) to Plaintiffs' use of Sassine Avenue. Plaintiffs assert that Ordinance 106-41(b)(13) places a limitation on the authority of the Public Works Director. Accordingly, Plaintiffs maintain that Roberts exceeded her authority when she incorrectly concluded that 106-41(b)(13) did not apply. Like Ordinance 106-7, Ordinance 106-41(b)(13) enables the Public Works Department to "designate the routes along the streets of the city which must be followed by commercial vehicles engaged in steady hauling of material of any kind or which are carrying unusually long or heavy loads." Port Arthur, Tex., Ordinance 106-41(b)(13) (June 21, 2024). The ordinance, however, contains the following caveat:

> No such vehicles shall be prohibited from using any street for the purpose of going directly to or from any residential, commercial, or industrial establishment abutting on such street *for purposes of routine commerce*, provided that they enter such

street at the closest intersection to their destination and proceeding no farther than the next intersection in order to return to their point of entry.

*Id.* (emphasis added).

Here, Plaintiffs ask the court to interpret the meaning of "routine commerce" to determine whether Roberts's refusal to apply 106-41(b) was an *ultra vires* act. The court acknowledges and understands that it can interpret municipal ordinances under the canons of statutory interpretation. *See Hunt v. City of Diboll*, 574 S.W.3d 406, 422 (Tex. App.—Tyler 2017, pet. denied). The inquiry here, however, is not one of statutory interpretation, but rather of legal authorization. The phrase "routine commerce" is not defined anywhere in the Port Arthur Municipal Code. Additionally, as noted above, the Public Works Department is authorized to plan the operation of traffic on streets and highways in Port Arthur. In the absence of a definition and in light of the Public Works Director's discretion to plan and organize traffic, the court must conclude that Roberts had the discretion and authority to define the scope of "routine commerce." Therefore, the court cannot conclude that Roberts acted without authority in refusing to apply 106-41(b)(13).

### c.    Texas Natural Resources Code

Lastly, the Plaintiffs assert that Roberts committed an *ultra vires* act in restricting Thomas's use of Sassine Avenue because her actions conflict with § 81.0523 of the Texas Natural Resources Code. Again, an official commits an *ultra vires* act if the act is in conflict with controlling state law. *Chambers-Liberty Cntys. Navigation Dist.*, 575 S.W.3d at 349. Consequently, if Port Arthur's ordinances are preempted by the Texas Natural Resources Code, then enforcement of the ordinances would constitute an *ultra vires* act. *See id.* Section 81.0523(b) provides:

26

> An oil and gas operation is subject to the exclusive jurisdiction of this state. Except as provided by Subsection (c), a municipality or other political subdivision may not enact or enforce an ordinance or other measure, or an amendment or revision of an ordinance or other measure, that bans, limits, or otherwise regulates an oil and gas operation within the boundaries or extraterritorial jurisdiction of the municipality or political subdivision.

TEX. NAT. RES. CODE § 81.0523 (emphasis added). The same statute, however, provides a limited exception for the creation and enforcement of ordinances that:

(1)    regulate above ground activity;

(2)    are commercially reasonable; and

(3)    do not effectively prohibit an oil and gas operation conducted by a reasonably prudent operator.

See id. at § 81.0523(c). Additionally, § 81.0523 states that an ordinance that has been in effect for at least five years and has allowed the oil and gas operations at issue to continue establishes a prima facie showing that the ordinance is commercially reasonable. Id. at § 81.0523(d).

At this juncture, it must be remembered that the burden is on the Plaintiffs to demonstrate that Roberts committed an *ultra vires* act. *XTC Cabaret (Dall.) v. City of Dallas*, 734 F. Supp. 3d 569, 595 (N.D. Tex. 2024). Plaintiffs have the burden to "allege, and ultimately prove that the officer acted without legal authority or failed to perform a purely ministerial act." *Harper v. Travis Cnty. Emergency Servs. Dist. 5*, No. 1-17-01174-AWA, 2019 WL 96310, at *3 (W.D. Tex. Jan. 3, 2019). Consequently, Plaintiffs must prove that the enforcement of Ordinances 106-7 and 106-8 conflicts with § 81.0523 of the Texas Natural Resources Code, and does not fall within the exception contained in subsection (c).

The parties do not dispute that Ordinances 106-7 and 106-8 fall within the general prohibition contained in § 81.0523(b). Section 81.0523(b) prohibits the creation or enforcement

of an ordinance that bans, limits or otherwise regulates an oil and gas operation.  TEX. NAT. RES. CODE § 81.0523(b).  An oil and gas operation is defined in § 81.0523(a)(2) as an activity associated with the exploration, development, production, processing, and transportation of oil and gas, which includes, among other things, disposal activities.  *Id.* at § 81.0523(a)(2).  Ordinances 106-7 and 106-8 do not facially limit or target oil and gas operations.  Nevertheless, the enforcement of the ordinances as applied to Plaintiffs' use of Sassine Avenue limits and regulates an oil and gas operation within the meaning of § 81.0523(c).  Thomas's landfarming operation is a "disposal" activity because the process disposes of drilling mud that was used for oil and gas drilling operations.  Additionally, KT Trucking participates in oil and gas operations by routinely hauling oil and gas equipment.  Therefore, Ordinances 106-7 and 106-8 fall within the scope of § 81.0523(b) because they regulate and potentially limit the accessibility of Thomas's property for purposes of engaging in his disposal and hauling activities.

Because the enforcement of Ordinances 106-7 and 106-8 is prohibited by the text of § 81.0523(b), the application of the ordinances to Plaintiffs' use of Sassine Avenue is an *ultra vires* act unless the exception contained in § 81.0523(c) applies.  Conversely, the enforcement of Ordinances 106-7 and 106-8 is *not* an *ultra vires* act if the enforcement is commercially reasonable and does not effectively prohibit a prudent operator's oil and gas operation.  Thus, Plaintiffs must demonstrate that the enforcement of the ordinances does not fall within the scope of the exception contained in § 81.0523(c).

i.    Commercially Reasonable Standard

An ordinance is commercially reasonable if it allows "a reasonably prudent operator to fully, effectively, and economically exploit, develop, produce, process, and transport oil and gas,

as determined based on the objective standard of a reasonably prudent operator and not on an individualized assessment of an actual operator's capacity to act." TEX. NAT. RES. CODE § 81.0523(a). Here, there exists a genuine dispute of material fact as to whether the ordinances permit Thomas to "fully, effectively, and economically exploit" his landfarming operation. First, there is evidence that commercial traffic cannot, or should not, access Thomas's property via any other route.[7] There are two points of entry for Thomas's property. The White Bridge provides one entrance, and Sassine Avenue provides the other. Plaintiffs' Exhibit S contains a letter from the LNVA instructing Thomas that third parties are not permitted to access his property via the White Bridge without first obtaining authorization from the LNVA.[8] The letter also notes that the LNVA's concern arises from the fact that the bridge crosses a fresh-water supply canal.[9] Accordingly, the letter supports the inference that the LNVA may refuse to authorize Thomas's use of the White Bridge to transport drilling mud or other oil and gas equipment.

Additionally, Thomas provides Droddy's expert report, which maintains that it is not safe for commercial traffic to access Thomas's property via the White Bridge. Droddy contends that the sharp angle of the turn combined with the size of most commercial vehicles place vehicles traveling to Thomas's property in a precarious position when turning onto the White Bridge from West Port Arthur Road.[10] Therefore, if Sassine Avenue provides the only safe access point for

---

[7] (Pls.' Ex. B, Plea to the Jurisdiction Hearing 31:17-35:24); (Pls.' Ex. HH, Droddy's Dep. 68:3-70:22).

[8] (Pls.' Ex. S, LNVA Letter 1).

[9] (*Id.*).

[10] (Pls.' Ex. HH, Droddy's Dep. 68:3-70:22).

Thomas's oil and gas operations, then it is more likely that Port Arthur's ordinances are not commercially reasonable under § 81.0523(a).

Second, Thomas has provided evidence that the city's restrictions on his use of Sassine Avenue do not permit him the full and effective exploitation of his oil and gas operations because the application process delays and deters business. First, Plaintiffs note that, because their operations involve contracting with different pipeline companies for each disposal project, it is difficult to obtain a permit for each and every project as it involves a long application process that requires information from the third party companies.[11] Additionally, because of the fast-paced nature of the disposal projects, the permit process as it currently stands is impractical. Furthermore, Plaintiffs note that Port Arthur is exceptionally slow to take action with respect to any road use agreement, meaning that even when Plaintiffs have submitted applications, they were not approved until after the project was intended to take place.[12] Plaintiffs also highlight that Roberts has enforced the ordinances in a commercially unreasonable manner because, despite being empowered to enter a road use agreement without obtaining any subsequent approval, Roberts has chosen to require city council approval to enter such an agreement.[13] Accordingly, when viewing the evidence in the light most favorable to Plaintiffs, the lengthy nature of the process combined with the imposition of additional and allegedly unnecessary requirements supports the conclusion that there exists a genuine dispute of material fact on the issue of whether the ordinances are enforced in a commercially reasonable manner.

---

[11] (Defs.' Ex. S, Road Use Permit App.).

[12] (Pls.' Ex. V, Thomas's Testimony 21:5-8).

[13] Port Arthur, Tex., Ordinance 106-8(b) (June 21, 2024); (Pls.' Ex. GG, City Council Mins. 18).

ii.     Reasonably Prudent Operator Standard

Defendants assert that Plaintiffs cannot demonstrate that Thomas is a reasonably prudent operator.  Specifically, Defendants contend that the legislative history of § 81.0523 supports the conclusion that Thomas is not a reasonably prudent operator.  In a Bill Analysis published by the Texas House of Representatives Energy Resources Committee, the committee states that the integration of the reasonably prudent operator standard serves to prevent the statute from having an overly broad effect on ordinances.  See H.R. Comm. on Energy Resources, 84th Leg., *Bill Analysis Tex. H.B. 40.,* R.S. 7 (2015).  For example, the analysis states that "an operator could not argue that it should be allowed to drill in the middle of Main Street for any number of reasons, but primarily because a reasonably prudent operator would not locate a well site in the middle of a major road." *Id.*  Analogously, Defendants contend that a reasonably prudent operator would not attempt to operate a landfarming operation by connecting one's property to a residential road that was not designed or constructed to sustain repeated heavy traffic.

Defendants' position, however, is reductive.  First, a truly analogous inquiry would ask whether a reasonably prudent operator would locate a landfarming operation on Thomas's property, and there exists evidence supporting an affirmative answer.  As Defendants note multiple times, this property has been in Thomas's family for generations.  The property is zoned for industrial use and has been used for agricultural purposes for many years.  Thomas has provided evidence that water-based drilling mud can be used to grow crops because of its role in creating a nutrient dense soil.[14]  As a result, a reasonably prudent operator may very well conclude that Thomas's property offers an appropriate location to maintain a landfarming operation.

---

[14] (Pls.' Ex. B, Thomas's Testimony 45:21-46:7, March 25, 2021).

31

Second, in evaluating Defendants' contention at face value, a factual dispute still exists as to whether a reasonably prudent operator would have concluded that it was appropriate to connect Thomas's property to Sassine Avenue for purposes of commercial access. Thomas acquired the property from Sylvester, who used Sassine Avenue to provide commercial access to his junkyard operation.[15] The junkyard operation required the use of large commercial vehicles, which both entered and exited Sylvester's property via Sassine Avenue.[16] Moreover, Thomas has provided some evidence that the pathway he used to connect his property to Sassine Avenue already existed.[17] Thomas also notes that he used Sassine Avenue for commercial access for many years without incident. Therefore, a jury could conclude that a reasonably prudent operator would attempt to operate a landfarming operation by connecting Thomas's property to Sassine Avenue.

In summary, Roberts did not commit an *ultra vires* act simply by interpreting and applying Ordinances 106-7, 106-8, and 106-41. There exists, however, a genuine dispute of material fact as to whether Roberts acted in conflict with state law in applying Ordinances 106-7 and 106-8 to Thomas's oil and gas operations. Specifically, the enforcement of the relevant ordinances may be preempted by § 81.0523 of the Texas Natural Resources Code. Because fact issues exist as to whether the enforcement of the ordinances was commercially reasonable and whether Thomas constitutes a reasonably prudent operator, summary judgment is not warranted on Roberts's claim of governmental immunity. Thomas, likewise, is not entitled to summary judgment on his *ultra*

---

[15] (Pls.' Ex. AA, Thomas's Testimony 75:2-22, July 11, 2024).

[16] (*Id.*).

[17] (*Id.*).

*vires* claims against Roberts because he has failed to establish as a matter of law that Roberts's actions violate § 81.0523.

> D.   Surface Transportation Assistance Act

Section 31114(a) of the Surface Transportation Assistance Act ("STAA") prohibits a state from enacting or enforcing a law that denies a commercial motor vehicle reasonable access between the Interstate Highway System and various terminals for food, fuel, and rest, among other things. 49 U.S.C. § 31114(a). Plaintiffs contend that summary judgment is warranted on their claim under the STAA because Defendants' enforcement of Ordinances 106-7 and 106-8 denies reasonable access between the interstate and his property. Defendants, however, assert that they are entitled to summary judgment because the STAA does not create a private right of action.

The STAA does not explicitly create a private cause of action. 49 U.S.C. §§ 31111-31115. A private cause of action, however, may be implied when a statute (1) contains right-creating language and (2) displays "an intent to create a private remedy." *Vote.Org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023) (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002)). Plaintiffs bear the "relatively heavy burden to show Congress *intended* private enforcement, and must overcome the presumption that Congress *did not intend* to create a private cause of action." *Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006) (emphasis added) (citing *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 521-22 (5th Cir. 2002)). Courts have reached different conclusions regarding whether the STAA creates an implied private right of action. *Compare Corey v. Rockdale County*, 689 F. Supp. 3d 1251, 1262 (N.D. Ga. 2023), *and Comm. Warehouse Leasing, LLC v. Thomas*, No. 4:18-CV-00135-JHM, 2019 WL 187872, at *5 (W.D. Ky. Jan. 14, 2019) (citing *Mason & Dixon Lines, Inc. v. Steudle*, 683 F.3d 289 (6th Cir. 2012)). The Fifth Circuit has not addressed

the issue.  Consequently, in the absence of controlling authority and the presence of conflicting persuasive authority, the court must conduct an independent analysis to determine whether a private right of action may be brought under the STAA.

The ultimate question that must be answered is whether Congress intended to create an implied private cause of action and permit private enforcement of the STAA.  *See Hernandez v. Mesa*, 885 F.3d 811, 815 (5th Cir. 2018); *Guardian Flight LLC v. Health Care Serv. Corp.*, 735 F. Supp. 3d 742, 749 (N.D. Tex. 2024).  As noted above, the first step in ascertaining Congress's intent is to assess whether the statute contains "right-creating language."  *Vote.Org*, 89 F.4th at 473.  A statute contains "right-creating language" when the provision in question is phrased in terms of the persons benefitted or unmistakably focuses on the benefitted class.  *Health & Hosp. Corp. Of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023).

Section 31114(a) does not contain any right-creating language, nor does it focus on, or even mention, a benefitted class.  Rather, the statute bars states from denying reasonable access to "a commercial motor vehicle."  Additionally, in identifying the locations to which reasonable access cannot be denied, Congress refers only to "terminals, facilities for food, fuel repairs, and rest . . . ."  Congress could have easily directed the statutory language towards the individuals operating the motor vehicles, terminals, or facilities.  Instead, Congress chose to focus on the vehicles and locations entitled to reasonable access.  Therefore, because § 31114(a) does not contain any right-creating language, a private right of action cannot be implied.

Alternatively, Plaintiffs maintain that they are permitted to bring a private right of action under the Supremacy Clause.  The Supremacy Clause mandates that courts shall not give effect to state laws that conflict with federal law.  *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 754

(6th Cir. 2019). The Supremacy Clause, however, is not a source of any federal right. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015). In *Armstrong*, the Supreme Court of the United States clarified that the Supremacy Clause does not create a cause of action for its violation. *Id.* at 326. The Supreme Court noted that courts and litigants had mistakenly confused its historical recognition that courts may exercise their equitable powers to prevent injuries flowing from the violation of the Supremacy Clause for the creation of a private right of action. *Id.* at 326-27. As a result, a claim for preemption does not arise under the Supremacy Clause, but, rather, it arises in equity. *Id.* Thus, the court must evaluate whether a suit may be brought to enforce the STAA in equity.

The primary inquiry in determining whether a preemption claim can be maintained in equity under the STAA is whether Congress intended to preclude private enforcement. *Armstrong*, 575 U.S. 320. Plaintiffs maintain that *Armstrong* is not controlling in the present case because the STAA does not preclude private enforcement nor is the language of the statute difficult to administer, as was the case in *Armstrong*. In support of their position, Plaintiffs highlight multiple cases in which courts have purportedly concluded that the STAA may be enforced in equity. *Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1037 (7th Cir. 2008); *see Comm. Warehouse Leasing, LLC*, 2019 WL 187872, at *5; *Garza v. City of La Porte*, 160 F. Supp. 986, 995 (S.D. Tex. 2016); *Tex. Motor Transp. Ass'n, Inc. v. City of Lancaster*, No. 3:05-CV-0259-N, 2006 WL 8437368, at *1 (N.D. Tex. Feb. 10, 2006). Plaintiffs' reliance on the cited cases is unpersuasive.

First, the most salient of the authorities cited is an opinion issued by the United States Court of Appeals for the Seventh Circuit in the case of *Aux Sable Liquid Products v. Murphy*. 526

F.3d at 1032-33.  The Seventh Circuit is one of four circuit courts either to recognize, explicitly or implicitly, that a private litigant may maintain a preemption claim to enforce the STAA.  *Id.*; *Mason & Dixon Lines Inc.*, 683 F.3d at 296; *Trescott v. Fed. Hwy Admin.*, 275 F. App'x 15, 16 (D.C. Cir. 2008); *NH Motor Transp. Ass'n v. Town of Plaistow*, 67 F.3d 326, 326 (1st Cir. 1995).  Specifically, the cited precedent stands for the proposition that a preemption claim under the STAA can be maintained pursuant to the Supremacy Clause.  *Mason & Dixon Lines Inc.*, 683 F.3d at 296; *Trescott*, 275 F. App'x at 16; *Aux Sable Liquid Prods.*, 526 F.3d at 1032; *NH Motor Transp. Ass'n*, 67 F.3d at 326.

Notably, the cited circuit court opinions were decided before the Supreme Court's ruling in *Armstrong*.  575 U.S. at 328.  Consequently, these cases recognize a cause of action that was explicitly disavowed by the Supreme Court in *Armstrong*.  *Id.* at 326-27 (recognizing that the Supremacy Clause does not create *any* cause of action).  As noted above, *Armstrong* recognized that any preemption claim must arise out of equity, as opposed to the Supremacy Clause.  *Id.*  The circuit courts that permitted a preemption claim to proceed under the STAA did not evaluate whether a preemption claim could be brought in equity because they assumed that it could be maintained pursuant to the Supremacy Clause.  *Mason & Dixon Lines Inc.*, 683 F.3d at 296; *Trescott*, 275 F. App'x at 16; *Aux Sable Liquid Prods.*, 526 F.3d at 1032; *NH Motor Transp. Ass'n*, 67 F.3d at 326.  Accordingly, the circuit court precedent has lost its instructive value.

There are, however, multiple district court cases that address the issue of whether a cause of action may be maintained in equity to enforce the STAA following the Supreme Court's decision in *Armstrong*.  Some courts have held that a private action to enforce the STAA can be

maintained in equity,[18] while others have concluded that it may not.[19]  Of consequence, however, is that the courts that concluded a claim can be maintained in equity did not reach that conclusion by conducting an independent analysis.  *See Comm. Warehouse Leasing, LLC*, 2019 WL 187872, at *5; *Garza*, 160 F. Supp. 3d at 995.  Rather, these opinions rely either on the circuit court authorities decided prior to the Supreme Court's ruling in *Armstrong* or they fail to address the issue at all.  *See Comm. Warehouse Leasing, LLC*, 2019 WL 187872, at *5 ("This language along with the existence of case law, including a case in the Sixth Circuit in which private plaintiffs sued to enforce the reasonable access provision of the STAA persuades this Court that a private right of action exists under this statute."); *Garza*, 160 F. Supp. 3d at 995 (allowing a claim under the STAA to proceed despite not analyzing whether such a claim was permissible under the STAA or the Supremacy Clause).  Consequently, the court finds these cases unpersuasive.

Like the court in *Corey v. Rockdale County*, the court finds that *Armstrong* precludes a suit in equity to enforce the reasonable access provision of the STAA.  In *Armstrong*, the Supreme Court evaluated whether a suit could be brought in equity on the grounds that the Medicaid Act preempted state or local law.  *Armstrong*, 575 U.S. 320.  The answer, however, turned on whether Congress intended to foreclose equitable relief.  *Id.*  The Court relied on two aspects of the Medicaid Act to determine that Congress intended to preclude equitable relief.  *Id.* at 328. First, the Medicaid Act provides a specific enforcement provision, which the Court concluded reflects a congressional intent to foreclose private enforcement.  *Id.* (recognizing that courts have

---

[18] *Comm. Warehouse Leasing, LLC*, 2019 WL 187872, at *5; *Garza*, 160 F. Supp. 3d at 995.

[19] *Corey*, 689 F. Supp. 3d at 1262; *Lewis v. DBI Servs.*, No. SA-19-CV-00662-DAE, 2020 WL 248703, at *3 (W.D. Tex. 2020).

consistently held that Congress's creation of a specific enforcement mechanism indicates that it intended to preclude others).  Therefore, the Court reasoned that the enforcement provision set forth in the Medicaid Act supported the conclusion that Congress intended to preclude equitable relief.  *Id.*

Second, the Court found the language of the Act to be "judicially unadministrable."  *Id.*  Specifically, the Court noted that the Medicaid Act imposed a broad and amorphous mandate.  The Court reasoned that the imposition of a nebulous standard combined with the inclusion of a provision explicitly charging the Secretary of Health and Human Services with the enforcement of that standard reflected an intent to preclude private enforcement.   Thus, Congress's decision to confer enforcement of the judgment-laden standard on the Secretary established that Congress wanted to "'make the agency remedy that it provided exclusive,' thereby achieving 'the expertise uniformity, widespread consultation and resulting administrative guidance that can accompany agency decision making,' and avoiding 'the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action.'" *Id.* at 328-29 (citing *Gonzaga Univ.*, 536 U.S. at 292).

Similarly, the language of the STAA demonstrates that Congress intended to foreclose equitable relief.  First, the STAA provides a specific provision that delineates the method by which it is to be enforced.  49 U.S.C. § 31115.  Section 31115 states that "[o]n the request of the Secretary of Transportation, the Attorney General shall bring a civil action for appropriate injunctive relief to ensure compliance."  *Id.* (emphasis added).  Because the STAA provides a specific means of enforcement, it can be inferred that Congress intended to preclude other types of enforcement, including a private right of action.  *Armstrong*, 575 U.S. at 328.

Moreover, the "judgment-laden" standard contained in the STAA in addition to the congressional decision to charge the Secretary of Transportation with the enforcement of that standard further demonstrates Congress's intent to preclude private enforcement. The court, however, cannot go so far as to categorize the language of § 31114(a) as judicially unadministrable. Section § 31114(a) prohibits states from enacting or enforcing laws that deny "reasonable access" between the highway and certain terminals. 49 U.S.C. § 31114. Courts commonly and frequently apply the standard of reasonableness in a large variety of contexts. Nevertheless, as was the case in *Armstrong*, a standard of reasonableness is open to many interpretations and still poses the same risk of "inconsistent interpretations . . . that can arise out of an occasional inappropriate application of the statute in a private action." *Armstrong*, 575 U.S. at 328-29. Congress's decision to entrust the Secretary of Transportation with the decision of when enforcement should be sought reflects an intent to promote the widespread uniformity that arises with agency enforcement. *Id.* Consequently, the court concludes that Congress intended to preclude private enforcement of the STAA. Therefore, Plaintiffs are foreclosed from bringing an action to enforce the STAA in equity, and Defendants are entitled to summary judgment.

III.    Conclusion

Based on the foregoing analysis, the court is of the opinion that Port Arthur is entitled to summary judgment on Plaintiffs' *ultra vires* claims. Summary judgment is also warranted on Plaintiffs' *ultra vires* claims against Roberts based on her alleged misinterpretation of Ordinances 106-7, 106-8, and 106-41(b)(13). Roberts, however, is not entitled to summary judgment on Plaintiffs' *ultra vires* claim under § 81.0523 of the Texas Natural Resources Code. Accordingly, Plaintiffs' Motion for Summary Judgment (#26) is DENIED, and Defendants' Cross Motion for

Summary Judgment (#34) is GRANTED in part and DENIED in part.  Plaintiffs shall proceed to trial on their *ultra vires* claim under § 81.0523 of the Texas Natural Resources Code.

SIGNED at Beaumont, Texas, this 25th day of March, 2025.

_____

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE